**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  11-21620-CIV-ALTONAGA/SIMONTON**

**ELISE R. LOBEGEIGER**,

      Plaintiff,

vs.

**CELEBRITY CRUISES, INC.**, *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Celebrity Cruises Inc. ("Celebrity") and Royal Caribbean Cruises Ltd.'s ("Royal Caribbean['s]") Amended Motion to Strike and/or Dismiss Nonpecuniary Damages of Complaint and to Dismiss [Claims] III, V, VI, and VII of the Complaint (the "Cruise Lines' Motion") [ECF No. 34], filed on July 14, 2011; and upon the Yap Defendants'[1] Motion to Dismiss/Strike Plaintiff's Gross Negligence Claims (Claim XI) ("Yap Defendants['] Motion") [ECF No. 23], filed on July 8, 2011.  The Court has considered the parties' submissions and the applicable law.

## I.  FACTUAL BACKGROUND[2]

Elise Lobegeiger ("Elise" or "Plaintiff"), traveling with her mother, June Lobegeier ("June"), was a paying passenger aboard the cruise ship Celebrity Mercury during the "12-Night Ultimate Alaska Cruise" from May 5 to May 17, 2010.  (*See* Compl. ¶ 21).  On Mother's Day, May 9, 2010, after three days at sea, the Mercury was approaching Juneau, Alaska, the first port of call for the

---

[1]  The Yap Defendants are Defendant Andre Yap doing business as Teak, Etc.; Teak Etcetera; Maltindo; Malta; Anderson Teak; Anderson Mantels; and/or Teak Patio Mfg.

[2]  The allegations in the Complaint are taken as true.

Case No.  11-21620-CIV-ALTONAGA/Simonton

cruise.  (*See id.* ¶ 22).  Around noon that day, Elise and June picked up lunch at the buffet at the

Palm Springs Café, one of the restaurants aboard the Mercury.  (*See id.* ¶ 23).  They searched for a

table in the café and in the indoor pool area on Deck 11 where they could sit and eat their food.  (*See*

*id.*).  When they were unable to find an empty table, Elise suggested that she and June sit on adjacent

Brianna Sun Loungers[3] on the outside portion of Deck 11 to enjoy their meal.  (*See id.* ¶ 24–25).

June was not comfortable eating off her lap and so went back to the café to find an open seat at a

table.  (*See id.* ¶ 26).

Elise sat sideways on one of the Brianna Sun Loungers with her legs over the side and placed

her tray toward the foot of the lounger.  (*See id.* ¶ 27).  Because she wanted to sit upright to enjoy

her meal, Elise leaned around the side of the lounger so she could use her hand to adjust the back to

a more vertical position.  (*See id.* ¶ 30).  Elise was not leaning against the back or exerting any

pressure on it, but was sitting sideways and leaning away from the back to assure that no weight was

on it while she performed the adjustment.[4]  (*See id.* ¶ 31).  Without warning, the lounger's heavy

back crashed down on Elise's left hand.  The impact was so forceful it sliced through Elise's left

index finger, severing it at the third interphallangeal joint.  (*See id.* ¶¶ 32–34).

Elise did not immediately realize what happened.  In shock, she looked at the deck floor and

saw a bloody, inch-long section of her finger bearing bright pink nail polish.  Elise picked up the

---

[3]  The Brianna Sun Lounger is a lounge chair designed, manufactured, and sold by Anderson Teak, one of the Yap Defendants.  It has a reclining back that can be adjusted to four different positions, including completely flat.  The entire chair weighs 67 pounds.  (*See* Compl. ¶ 16).  Some time before May 2010, either Royal Caribbean or Celebrity purchased a large number of the Brianna Sun Loungers from Anderson Teak for use on its cruise ships, including the Mercury, by its passengers.  (*See id.* ¶ 18).

[4]  There were no instructions, safety labels, or warnings on or near the Brianna Sun Lounger she had chosen, nor were there any instructions, safety labels, or warnings on any of the other Brianna Sun Loungers on Deck 11.  (*See id.* ¶¶ 28–29).

lump off the deck floor and saw the bone jutting through the flesh.  Only then did she begin to understand her finger had been severed.  (*See id.* ¶¶ 34–36).

Unable to bring herself to look at the injured finger, Elise covered her hand with a napkin. (*See id.* ¶ 37).  Carefully carrying the detached segment of her finger, Elise approached the nearest Celebrity staff member, a woman named Aleksandra Klincarova ("Klincarova").  (*See id.* ¶ 38). Elise told Klincarova that she had a medical emergency, that her finger had been cut off, and that she needed immediate medical assistance.  Because she was "in shock and sensitive to the horrific appearance of her severed finger," Elise did not show Klincarova the severed digit. (*Id.* ¶ 39). Klincarova telephoned the medical bay to alert the medical team of Elise's injury, but she neither recognized nor conveyed it was an emergency.  As a result, there was no immediate assistance from the medical team.  (*See id.* ¶ 40).

Elise remained standing by the telephone with Klincarova, waiting for someone to help her. (*See id.* ¶ 41).  Klincarova remained inattentive to the seriousness of Elise's situation despite the fact that Elise asked repeatedly when the medical staff would arrive.  (*See id.* ¶¶ 42–43).  It was only when Elise removed the napkin to show Klincarova the remaining portion of her finger that Klincarova appreciated the severity of Elise's injury.  This led Klincarova to place a second call to the medical bay for assistance.  (*See id.* ¶ 44).  At no time did Klincarova attempt to administer any first aid to Elise or to otherwise treat the wound.  (*See id.* ¶ 45).  More than 10 minutes after Klincarova's first call to the medical bay, Constantin ("Constantin"), a nurse on the medical staff, arrived with a wheelchair, and Elise was taken to the medical facility on Deck 4.  (*See id.* ¶¶ 47–48).

Elise gave the amputated portion of her finger to a member of the Celebrity medical staff. (*See id.* ¶ 49).  Her injured hand was x-rayed, and she was given antibiotics, but no painkillers.  Elise

Case No.  11-21620-CIV-ALTONAGA/Simonton

was then examined by the ship's physician, Dr. Charles Laubscher ("Dr. Laubscher").  (*See id.* ¶ 50).

By the time Dr. Laubscher's examination began, Elise's initial shock had worn off, and she was

visibly distressed and crying.  (*See id.* ¶¶ 51–52).

Dr. Laubscher assured Elise he was very qualified and had a specific expertise in the area of

severed fingers because he had treated many similarly grievous injuries — severed limbs and

appendages — as a result of machete accidents during his medical practice in South Africa.  (*See id.*

¶ 53).  Relying on this expertise, Dr. Laubscher informed Elise that the injury to her finger was

catastrophic and that the amputated portion of her finger could not be reattached; he told Elise it was

useless to try to reattach the finger because it would be a "miracle if it took."  (*Id.* ¶ 54).  Elise did

not want to believe Dr. Laubscher, as she had often heard of fingers and toes being stitched back on,

but Dr. Laubscher told Elise to forget the rest of her finger and have a skin graft on what was left.

(*See id.* ¶¶ 55–56).  Dr. Laubscher told Elise the grafting process involved stretching a piece of skin

over the end of the severed finger to cover the wound and the exposed bone.  He told Elise that after

the graft, her index finger would be shortened by one joint.  (*See id.* ¶ 57).  More than an hour after

the injury, the detached portion of Elise's finger had not been placed on ice.  (*See id.* ¶ 58).

After the examination, a medical staff member cleaned the wounded remainder of Elise's

finger and bandaged the exposed flesh and bone.  (*See id.* ¶ 60).  Elise was then left alone in one of

the rooms in the medical bay to complete a "Statement of Guest or Visitor Accident/Illness" form.

(*See id.* ¶ 61).

While Elise was in this room, Dr. Laubscher placed a telephone call to an offboard Celebrity

medical professional located in Miami, Florida.  (*See id.* ¶¶ 64–65).  This medical professional

confirmed Dr. Laubscher's assessment and advised Dr. Laubscher to send Elise to a hospital in

4

Juneau where Elise would be able to receive a skin graft. (*See id.* ¶ 66).  An ambulance from the hospital was arranged to meet Elise when the ship docked at the port in Juneau.  (*See id.* ¶ 67).  Elise was still not given any medication to manage her pain.  (*See id.* ¶ 68).

Just before 2:00 p.m., Constantin escorted Elise to her room where June had been waiting, completely unaware that her daughter had been hurt. (*See id.* ¶ 69).  Not wanting to upset her mother on Mother's Day, Elise told June to carry on with a planned shore excursion without her.  (*See id.* ¶¶ 70–71).  Elise packed some clothes in a knapsack and returned to the medical offices on Deck 4. (*See id.* ¶ 72).

The Mercury docked in Juneau around 2:00 p.m., and Elise was taken by stretcher from Deck 4 to the dock. (*See id.* ¶¶ 73–74).  An ambulance met her there, and she was rushed to Bartlett Regional Hospital ("Bartlett Hospital").  (*See id.* ¶ 75).  When Elise arrived at Bartlett Hospital, a member of the staff asked Elise where the amputated end of her finger was. (*See id.* ¶ 76).  Elise was surprised by their interest in the severed finger because Dr. Laubscher had been confident that reattachment was  impossible. (*See  id.* ¶ 77).  Elise was even more surprised when the severed portion of the finger, packaged in a small plastic bag appeared and was handed over to the hospital staff.  (*See id.* ¶ 78).

At Bartlett Hospital, Elise was examined by Dr. Schwarting, an orthopedic surgeon.  (*See id.* ¶¶ 79–80).  Dr. Schwarting telephoned a former mentor in New York and consulted with him as to the chances of a reattachment being successful. (*See id.* ¶ 80).  Although there were concerns about the amount of time that had passed since the finger had been severed and the fact that the amputated portion had not been iced immediately after the injury, Dr. Schwarting and his colleague concluded that the best way to promote healing would be to re-attach the end of the finger, and allow the tip to

Case No.  11-21620-CIV-ALTONAGA/Simonton

serve as a "biologic dressing."  (*Id.* ¶¶ 81–82).

More than four-and-a-half hours after Elise's finger had been sliced from her hand, Dr. Schwarting performed surgery to reattach the amputated portion of Elise's finger.  (*See id.* ¶ 83). Elise's injured hand was carefully bandaged, and Elise was given painkillers.  (*See id.* ¶¶ 85–86). Dr. Schwarting gave Elise strict instructions not to remove the bandaging for five days, as earlier removal would hinder the healing and reattachment process; the discharge papers prepared at Bartlett Hospital repeated this instruction.  (*See id.* ¶¶ 86–87).

Elise returned to the Mercury and spent the rest of the cruise with her hand heavily bandaged and her arm bound in a sling.  (*See id.* ¶¶ 88–89).  When Elise returned to the Celebrity Mercury, Dr. Laubscher asked to see her immediately.  (*See id.* ¶ 106).  Dr. Laubscher appeared surprised that the amputated finger had been reattached.  (*See id.* ¶ 107).  He insisted repeatedly that he had to remove Elise's bandages and inspect the reattached finger. (*See id.* ¶ 110).  Elise told Dr. Laubscher that it was Dr. Schwarting's strict instruction to keep the bandages on for five days.  (*See id.* ¶ 111).  Elise showed Dr. Laubscher the discharge papers provided by Bartlett Hospital that specifically stated the bandages were to remain on for five days, and repeated Dr. Schwarting's warning that removing the bandages early would jeopardize the healing and reattachment process.  (*See id.* ¶¶ 112–13).  In response, Dr. Laubscher told Elise that the hope of reattachment was ridiculous.  (*See id.* ¶ 114).

Dr. Laubscher removed the bandaging from Elise's reattached finger on the morning of Wednesday, May 12, 2010, a full two days earlier than Dr. Schwarting recommended.  (*See id.* ¶ 123).  Dr. Laubscher inspected Elise's finger, but after his close inspection, he made no specific comments or observations to her.  Following the examination, Dr. Laubscher telephoned Dr. Schwarting, who admonished Dr. Laubscher for prematurely removing the bandages.  (*See id.* ¶¶

Case No.  11-21620-CIV-ALTONAGA/Simonton

124–25).  It was decided that new bandages were to be kept on for an additional five days and that Dr. Laubscher would have no more involvement in her convalescence.  (*See id.* ¶ 126).

While she was still on the Mercury, Elise met John Clement, an accident reconstruction and failure analyst, who encouraged Elise to arrange a meeting with the Safety Officer aboard the ship, Mr. Christos Tryfillis.  (*See id.* ¶¶ 141–43).  On May 13, 2010, Elise, Mr. Clement, and Mr. Tryfillis met twice, and Mr. Clement measured, photographed, and sketched one of the Brianna Sun Loungers and took notes about its operation.  (*See id.* ¶¶ 144–53).  On May 15, 2010, Elise and Mr. Clement met a third time with Mr. Tryfillis.  (See id. ¶ 154).  Mr. Clement had discovered design elements of the Brianna Sun Lounger that he believed made it very easy for the back of the lounger to collapse suddenly, and so he showed Mr. Tryfillis how he believed the lounger could be made safe with either of two simple modifications.  (*See id.* ¶ 155–57).  Mr. Tryfillis responded that Celebrity was unwilling to modify the loungers or to remove them from the deck area, and no warnings were placed on or near the chairs for the duration of the cruise.  (*See id.* ¶ 159).

When Elise returned to Australia, she lived with the uncertainty as to whether the severed portion of her finger would reattach.  Finally, in August, three months after the injury, the tip of Elise's finger fell off.  Treatments for her injury continued for more than seven months.  (*See id.* ¶ 163).  As a result of her injury, Elise's left index finger is noticeably shortened; it "ends in a squared pyramid capped by a deformed nail . . . . [and t]he stump of the finger is covered in hard, tight skin[, which] looks like a talon and the nail like a claw."  (*Id.* ¶¶ 179–80).  The injury is a permanent disability that limits Elise's ability to care for herself, to socially interact with others, and to perform her job.  (*See id.* ¶¶ 163–65).

Case No.  11-21620-CIV-ALTONAGA/Simonton

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).  But pleadings that "are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 129 S. Ct. at 1950; *see also Sinaltrainal*, 578 F.3d at 1260 ("'[U]nwarranted deductions of fact' in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations.").

Case No.  11-21620-CIV-ALTONAGA/Simonton

### III.  ANALYSIS

In the Cruise Lines' Motion, Celebrity and Royal Caribbean (collectively, the "Cruise Lines") seek to dismiss the allegations of non-pecuniary damages from the Complaint because non-pecuniary damages are allegedly unavailable as a matter of law in a maritime case, and they seek to dismiss Claims III, V, VI, and VII of the Complaint because they fail to state a claim.  (*See* Cruise Lines' Mot. 1).  The Yap Defendants seek to dismiss Claim XI against Anderson Teak for failure to state a claim for gross negligence.  (*See* Yap Defs.' Mot. 1).  The Court first addresses the availability of non-pecuniary damages and then turns to the Cruise Lines' and Yap Defendants' specific arguments with respect to Claims III, V, VI, VII, and XI.

### A.    Availability of Non-pecuniary Damages under General Maritime Law

The Cruise Lines seek to dismiss portions of Claims I–VII that request non-pecuniary damages in the form of "'pain and suffering, . . . mental anguish and emotional distress, inconvenience, [and] loss of capacity for the enjoyment of life,'" and that reserve the right to seek punitive damages.  (Cruise Lines' Mot. 4).  According to the Cruise Lines, "[i]t is well settled that a personal injury claimant can only assert a claim under the general maritime law for pecuniary loss." (Cruise Lines' Mot. 4 (citing *Miles v. Apex Marine*, 498 U.S. 19, 33 (1990)).

The Cruise Lines' Motion raises two questions with respect to Plaintiff's damages demand. The first question is whether Plaintiff can recover for pain and suffering under general maritime law, and the second is whether she can recover punitive damages.  With regard to whether a passenger may recover for pain and suffering due to personal injury in a general maritime case, it is clear that such damages, despite being nominally non-pecuniary, are recoverable:

All authorities agree that damages recoverable for pain and suffering are non-

pecuniary damages.  All authorities agree that such damages are properly awarded in maritime personal injury cases.  Therefore, it is incorrect to say that in maritime personal injury and death cases only pecuniary damages may be recovered.

ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF MARITIME PERSONAL INJURIES § 11:8 (5th ed. 2010 Supp.); *accord* THE FEDERAL JUDICIAL CENTER, ADMIRALTY AND MARITIME LAW 84 (2004) ("Damages that may be recovered in maritime personal injury cases include . . . pain, suffering, and mental anguish."); *see also, e.g., Downie v. U.S. Lines Co.*, 359 F.2d 344, 347–48 (3d Cir. 1966) (laying out damages recoverable in maritime personal injury action in the context of an injured seaman); *Havinga v. Crowley Towing & Transp. Co.*, 24 F.3d 1480, 1485 (1st Cir. 1994) (permitting damages for pain and suffering and loss of enjoyment of life under general maritime law); *Schumacher v. Cooper*, 850 F. Supp. 438, 453 (D.S.C. 1994) ("Plaintiff is entitled to recover . . . past and future medical expenses, past and future pain and suffering, past and future loss of income and earning power, disfigurement, loss of enjoyment of life, and loss of family services.").[5]  Accordingly, Plaintiff is entitled to seek recovery for her pain and suffering, mental anguish and emotional distress, inconvenience, and loss of capacity for the enjoyment of life, and the Cruise Lines' request to strike or dismiss these damage demands is denied.[6]

---

[5]  "With few exceptions, the rules that define damages recoverable in maritime personal injury actions do not vary with the status of the parties.  Medical expenses, loss of wages, loss of future wages, loss of earning capacity, and pain and suffering are the same regardless of whether the injured plaintiff is a seaman, longshoreman, harbor worker, off-shore worker, *passenger* or recreational boater."  FORCE & NORRIS § 11:1 (collecting cases) (emphasis added).

[6]  The Cruise Lines contend that *In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Ala. on Sept. 22, 1993*, 121 F.3d 1421, 1429 (11th Cir. 1997), stands for the "unequivocal holding that 'personal injury claimants have no claim for nonpecuniary damages . . . .'" (Mot. 2 (quoting *Amtrak*, 121 F.3d at 1429)).  The Cruise Lines' reading of *Amtrak* is too broad.  *Amtrak* was limited to the question whether "personal injury plaintiffs . . . may seek nonpecuniary damages under the general maritime law for loss of society, loss of consortium, and punitive damages."  121 F.3d at 1428.  *Amtrak* did not purport to limit a personal injury plaintiff's right to recover for pain and suffering under general maritime law; on the contrary, *Amtrak* was concerned only with particular non-pecuniary damages, namely loss of society, loss of consortium, and

Case No. 11-21620-CIV-ALTONAGA/Simonton

Whether a passenger may recover punitive damages for personal injury under general maritime law is a more complicated question. The Cruise Lines contend that punitive damages are not available. They point to *Amtrak*, where the Eleventh Circuit decided "to preclude the availability of punitive damages in personal injury actions brought under the general maritime law." 121 F.3d at 1429.

Since that opinion, the Supreme Court, considering another Eleventh Circuit decision, *Atlantic Sounding Co., Inc. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007) [hereinafter *Atlantic Sounding I*], held "punitive damages have long been available at common law[, and] the common-law tradition of punitive damages extends to maritime claims." *Atl. Sounding Co., Inc. v. Townsend*, 129 S. Ct. 2561, 2569 (2009) [hereinafter *Atlantic Sounding II*] (footnote call number omitted). Indeed, another court in this District has observed that the Supreme Court's decision in *Atlantic Sounding II* "certainly raise[s] the question of whether *Amtrak* is now valid law." *Boney v. Carnival Corp.*, No. 08-22299-CIV, 2009 WL 4039886, at *1, n.1 (S.D. Fla. Nov. 20, 2009) ("While the Eleventh Circuit Court of Appeals stated in *Amtrak* that it looks 'disfavorably' on the availability of punitive damages under maritime law, the Supreme Court has now suggested that punitive damages are available in general maritime claims unless Congress has expressed otherwise.").

The Cruise Lines nevertheless maintain that "*Atlantic Sounding II* allowed for punitive nonpecuniary damages under general maritime law in a seaman's maintenance and cure action and, as a result, has no application to the instant case." (Reply 3 [ECF No. 42]). This argument reads *Atlantic Sounding II's* holding too narrowly.

The opinion in *Atlantic Sounding II* indicates punitive damages are available as damages in

_____

punitive damages. *See id.*

11

Case No.  11-21620-CIV-ALTONAGA/Simonton

all actions under general maritime law unless specifically limited by Congress.  Justice Thomas, writing for the majority explained, "[t]he general rule that punitive damages were available at common law extended to claims arising under federal maritime law." *Atl. Sounding II*, 129 S. Ct. at 2567 (citing *Lake Shore & Mich. S. R. Co. v. Prentice*, 147 U.S. 101, 108 (1893) ("[C]ourts of admiralty . . . proceed, in cases of tort, upon the same principles as courts of common law, in allowing exemplary damages.")); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 514–15 (2008) (permitting punitive damages in a property damage case under general maritime law). Moving from maritime law generally to the specific case of a seaman's action for maintenance and cure, the Supreme Court held "[n]othing in maritime law undermines the applicability of this general rule in the maintenance and cure context." *Atl. Sounding II*, 129 S. Ct. at 2568.  It concluded, "[a]s a result, respondent is entitled to pursue punitive damages unless Congress has enacted legislation departing from this common-law understanding." *Id.* at 2569.

Here, like in *Atlantic Sounding II*, Congress has not enacted any legislation to limit a passenger's right to recover punitive damages in a personal injury action under general maritime law. As the Supreme Court made clear, "the general common-law rule made punitive damages available in maritime actions." *Id.* at 2569 n.4.  This general statement of the law served as an essential premise supporting the Supreme Court's ultimate conclusion that punitive damages are available in the maintenance and cure context and is decisive of the issue in this case.  Therefore *Amtrak*, to the extent that it foreclosed a plaintiff's right to seek punitive damages in a personal injury case under general maritime law, is clearly inconsistent with *Atlantic Sounding II* and is no longer the correct

Case No.  11-21620-CIV-ALTONAGA/Simonton

rule of decision in the Eleventh Circuit.[7]

Accordingly, a plaintiff may recover punitive damages under general maritime law, consistent with the common-law rule, where the plaintiff's injury was due to the defendant's "wanton, willful, or outrageous conduct."  *Id.* at 2566; *see also Exxon Shipping*, 554 U.S. at 493 ("The prevailing rule in American courts also limits punitive damages to cases . . . where a defendant's conduct is outrageous, . . . owing to gross negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable.") (internal quotations and citations omitted).  Therefore, the Court will not strike Plaintiff's reservation of her right to amend the Complaint to seek punitive damages should discovery reveal evidence that the Cruise Lines' conduct warrants them.  *See Atl. Sounding II*, 129 S. Ct. at 2567–68 (quoting *Boston Mfg. Co. v. Fiske*, 3 F. Cas. 957 (No. 1,681) (CC Mass. 1820) (Story, J.) ("In cases of marine torts . . . it is far from being uncommon in the admiralty to allow costs and expences, and to mulct the offending parties, even in exemplary damages, where the nature of the case requires it.")).

## B. Claim III: Res Ipsa Loquitur

The Cruise Lines ask the Court to dismiss Claim III titled "Presumption of Negligence Based on Res Ipsa Loquitur" (Compl. ¶ 247) because *res ipsa loquitur* is neither a rule of substantive tort law nor a theory of recovery, but a rule of circumstantial evidence.  (*See* Cruise Lines' Mot. 5–6).

---

[7] In *Amtrak*, the Eleventh Circuit announced "[u]nless or until the United States Supreme Court should decide to add state remedies to the admiralty remedies for personal injury, personal injury claimants have no claim for nonpecuniary damages such as . . . punitive damages." 121 F.3d at 1429.  Thereafter, in *Atlantic Sounding II*, the Supreme Court decided that punitive damages did not need to be added to the remedies available in admiralty, but instead recognized that punitive damages have traditionally been, and still remain, available as a remedy under general maritime law.  Therefore, according to the standard by which *Amtrak* asked that it be judged, it is no longer good law.

Case No.  11-21620-CIV-ALTONAGA/Simonton

The Cruise Lines are correct.

"The Supreme Court has developed a law of *res ipsa loquitur* in admiralty that permits the trier of fact to draw inferences of negligence from unexplained circumstances."  *Estate of Larkins by Larkins v. Farrell Lines, Inc.*, 806 F.2d 510, 512 (4th Cir. 1986) (citing *Johnson v. United States*, 333 U.S. 46, 68 (1948)); *see also Smith v. United States*, 96 F.2d 976, 978 (5th Cir. 1938) ("[*Res ipsa loquitur*] is a rule of interpretation by which evidence of facts is made to speak the logical conclusions naturally flowing therefrom.").  Specifically,

> In admiralty, *res ipsa loquitur* may be most relevant in determining which cases of unexplained circumstances should go to the jury.  Where the "balance of probabilities" might reasonably be found in favor of negligence, submission [of a jury instruction on *res ipsa loquitur*] is required.  The mere happening of an accident, however, does not give rise to a *res ipsa* inference of negligence or breach of duty under the Jones Act or general maritime law.

*Estate of Larkins*, 806 F.2d at 512 (citation omitted).  The jury may receive a *res ipsa loquitur* instruction if the plaintiff establishes "'(1) the event is of a type which ordinarily does not happen in the absence of someone's negligence; (2) the instrumentality causing the injury was, at the time of the accident, within the exclusive control of the defendant; [and] (3) the accident was not due to any voluntary action or contribution on the part of the plaintiff.'"  *Id.* at 513 (quoting *Olsen v. States Line*, 378 F.2d 217, 220 (9th Cir. 1967); *Savard v. Marine Contracting*, 471 F.2d 536, 542 (2d Cir. 1972)).

On that account, *res ipsa loquitur* is not a separate cause of action but an evidentiary doctrine that permits the trier of fact to infer *negligence* from circumstantial evidence.  The appropriate time for the Court to determine whether to instruct the jury on the doctrine of *res ipsa loquitur* is not on a Rule 12(b)(6) motion for failure to state a claim.  Accordingly, Claim III is dismissed, but the Court

14

reserves decision on whether a *res ipsa loquitur* instruction will be appropriate in this case.

**C.     Claim V:  Negligence by Apparent Agency**

In Claim V of the Complaint, Plaintiff alleges Celebrity is negligent for the actions of Dr. Laubscher and the cruise medical staff under a theory of apparent agency.  (*See* Compl. ¶¶ 261–69). Celebrity contends this claim must be dismissed for two reasons.  First, Celebrity asserts that under maritime law, a shipowner cannot be held liable for the medical negligence of a shipboard doctor under an agency theory.  (*See* Mot. 9–10).  Second, Celebrity contends any belief on Plaintiff's part that Dr. Laubscher and the other members of the medical staff were agents of Celebrity was not reasonable.  (*See id.* 10–14).  Consequently, Celebrity maintains that even if it could be held liable for the actions of the medical staff under an apparent agency theory, the Complaint does not sufficiently plead the elements of such a theory.  (*See id.*).  The Court addresses each of these arguments in turn.

**1.  Liability of Shipowners for Negligent Acts of Shipboard Doctors**

The Eleventh Circuit has not addressed whether a cruise line can be held liable for the negligence of a shipboard doctor.  However, the majority rule, discussed in *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364 (5th Cir. 1988), has been followed by federal courts for over a century and establishes that a cruise line cannot be held vicariously liable for the negligence of a ship's doctor in the care and treatment of passengers.  *See id.* at 1369; *see also Doonan v. Carnival Corp.*, 404 F. Supp. 2d 1367, 1370 (S.D. Fla. 2005) (noting *Barbetta* is the majority rule); *Wajnstat v. Oceania Cruises, Inc.*, No. 09–21850–Civ, 2011 WL 465340, at *2 (S.D. Fla. Feb. 4, 2011) ("[M]aritime law has long held that a ship's doctor's negligence in treating a passenger 'will not be imputed to the carrier.'") (quoting *Barbetta*, 848 F.2d at 1369).  "The rule stems from the standard for imputing

Case No.  11-21620-CIV-ALTONAGA/Simonton

vicarious liability upon a principal for the acts of its agents, a standard that turns primarily on the ability of a principal to control those acts."  *Suter v. Carnival Corp.*, No. 07-20298-CIV, 2007 WL 4662144, at *3 (S.D. Fla. 2007).

In *Barbetta*, the Fifth Circuit articulated two justifications for the traditional maritime rule. *See Barbetta*, 848 F.2d at 1369.  The first justification "emphasizes the nature of the relationship between the passenger and the physician, and the carrier's lack of control over that relationship." *Id.*  As the court explained:

> The work which the physician or surgeon does . . . is under the control of the passengers themselves.  It is their business, not the business of the carrier . . . The master or owners of the ship cannot interfere in the treatment of the medical officer when he attends a passenger.  He is not their servant engaged in their business, and subject to their control as to his mode of treatment.

*Id.* (citation omitted).  The second justification is based on the cruise line's limited knowledge of medicine.  In particular, the *Barbetta* court noted:

> [A] shipping company is not in the business of providing medical services to passengers; it does not possess the expertise requisite to supervise a physician or surgeon carried on board a ship as a convenience to passengers.  A ship is not a floating hospital; a ship's physician is an independent medical expert engaged on the basis of his professional qualifications and carried on board a ship for the convenience of passengers, who are free to contract with him for any medical services they may require.

*Id.* at 1369–70 (citation omitted).  Basically, "because a cruise line lacks control over the doctor-patient relationship and is not possessed of the institutional knowledge of medicine, courts have concluded that a cruise line does not sufficiently control the acts of a shipboard doctor so as to be held vicariously liable for the doctor's acts."[8]  *Suter*, 2007 WL 4662144, at *4.

_____

[8]  The Court notes there is recent disagreement regarding the continuing viability of the *Barbetta* rule.  Until recently, the lone case dissenting on this issue was *Nietes v. American President Lines, Ltd.*, 188 F. Supp. 219 (N.D. Cal. 1959), in which the court held:

16

Case No.  11-21620-CIV-ALTONAGA/Simonton

Notwithstanding the rationale in *Barbetta*, several courts, including this Court, have found it permissible for a court sitting in admiralty to hear vicarious liability claims premised on shipboard doctors' negligence under the theory of *apparent* agency.  *See Hajtman v. NCL (Bahamas) Ltd.*, 526 F. Supp. 2d 1324, 1328 (S.D. Fla. 2007); *Suter*, 2007 WL 4662144, at *6 (Altonaga, J.); *Peterson v. Celebrity Cruises, Inc.*, 753 F. Supp. 2d 1245, 1248 (S.D. Fla. 2010) ("The Court generally agrees that *Barbetta* does not prohibit, as a matter of law, such apparent agency claims."); *Doonan*, 404 F. Supp. 2d at 1371–72 & n.2 (dismissing passenger's actual agency claim where the passenger's allegations were insufficient to justify deviation from the majority rule, but declining to dismiss

---

> [W]here a ship's physician is in the regular employment of a ship, as a salaried member of the crew, subject to the ship's discipline and the master's orders, and presumably also under the general direction and supervision of the company's chief surgeon through modern means of communication, he is, for the purposes of respondeat superior at least, in the nature of an employee or servant for whose negligent treatment of a passenger a shipowner may be held liable.

*Id.* at 220.  Recently, however, a minority of courts have adopted the *Nietes* rationale and rejected the *Barbetta* rule regarding actual agency.  *See Huntley v. Carnival Corp.*, 307 F. Supp. 2d 1372, 1374 (S.D. Fla. 2004) (quoting *Carlisle v. Carnival Corp.*, 864 So. 2d 1, 5 (Fla. 3d DCA 2003), *rev'd by* 953 So. 2d 461, 470 (Fla. 2007)); *Fairley v. Royal Cruise Line Ltd.*, 1993 AMC 1633, 1639 (S.D. Fla. 1993); *Mack v. Royal Caribbean Cruises, Ltd.*, 838 N.E.2d 80, 91 (Ill. App. 1st Dist. 2005) (finding that federal maritime law is unsettled and affirming the denial of the ship owner's motion to dismiss in accord with the holdings of *Nietes*, *Huntley*, and *Fairley*).

Some of the facts alleged in the Complaint suggest that the twin rationales underlying the *Barbetta* rule have weak application in this case.  The Complaint alleges that, during his treatment of Plaintiff, Dr. Laubscher contacted a Celebrity medical professional in Miami who confirmed Dr. Laubscher's diagnosis and advised him to send Plaintiff to a hospital in Juneau to receive a skin graft.  (*See* Compl. ¶¶ 64–66).  This suggests that, in contrast to the justifications underlying the majority rule as explained in *Barbetta*, Celebrity did control the mode of treatment followed by Dr. Laubscher.  Moreover, it shows that Celebrity (at least purports) to have the expertise to supervise its shipboard doctors.

Nevertheless, the Court need not address the viability of the *Barbetta* rule in this case because Claim V is not premised on a theory of actual agency; instead, the claim is based on a theory of apparent agency (*see* Resp. 10 [ECF No. 40]) ("Plaintiff's claim is not based in *respondeat superior* but in apparent agency. . .."), and as will be explained, the Court does not find *Barbetta* precludes apparent agency claims against cruise lines premised on a shipboard doctor's negligence.

17

Case No.  11-21620-CIV-ALTONAGA/Simonton

vicarious liability claim based upon apparent agency because "despite *Barbetta*, a [p]laintiff may be able to sustain an apparent agency claim"); *Warren v. Ajax Navigation Corp.*, No. 91-0230-CIV-RYSKAMP, 1995 WL 688421, at *3 (S.D. Fla. Feb. 3, 1995); *Fairley*, 1993 AMC at 1639. *But see Wajnstat*, 2011 WL 465340, at *4 ("[I]t does not matter whether the ship's physician is an actual agent, apparent agent, or otherwise[;] under maritime law the shipboard doctor's liability is not [to] be imputed to the carrier.  The rationale of the court in *Barbetta* does not leave room for pleading around the rule, by labeling the legal theory 'apparent authority' as opposed to '*respondeat superior*.'").

For example, in *Suter*, the undersigned noted the need to adhere to the federal principles of uniformity and harmony when applying federal maritime law and explained that "[u]nderscoring the principles of harmony and uniformity in maritime law is a need for ship owners and cruise lines to be placed on notice regarding the extent of their liability to passengers." *Suter*, 2007 WL 4662144, at *6.  However, the Court held that "permitting a claim of vicarious liability based on the theory of apparent agency would not disturb those maritime principles because cruise lines are well aware that if they affirmatively hold shipboard doctors out to passengers as their agents, they effectively lose their immunity from liability from any negligent acts of their shipboard doctors." *Id.*

In the instant case, the Court finds that permitting the application of apparent agency, assuming the necessary elements are satisfied, is consistent with the general maritime tort principles of harmony and uniformity.  *See id.*

### 2.  Sufficiency of the Allegations

Although cruise lines can be held liable for the negligence of shipboard doctors under an apparent agency theory, "these claims are difficult to establish." *Peterson*, 753 F. Supp. 2d at 1248.

18

Case No. 11-21620-CIV-ALTONAGA/Simonton

Under general maritime law, in order to state a claim premised on apparent agency, a plaintiff must demonstrate:

> 1) the alleged principal ma[de] some sort of manifestation causing a third party to believe that the alleged agent had authority to act for the benefit of the principal, 2) that such belief was reasonable, and 3) that the claimant reasonably acted on such belief to his detriment.

*Doonan*, 404 F. Supp. 2d at 1371. Here, Plaintiff has sufficiently pleaded each of these three elements.

### a. Manifestation by Celebrity

The determination of whether a cruise line has made some sort of manifestation that could cause a third party to believe a shipboard doctor is an agent of the cruise line is a question of fact. *See Doonan*, 404 F. Supp. 2d at 1371. A cruise line's representation that a certified doctor will be provided aboard the ship, does not, by itself, establish apparent agency. *See Warren*, 1995 WL 688421, at *3 (dismissing apparent agency claim where only representation made by cruise line was that the doctor was the ship's doctor). Instead, a plaintiff must demonstrate "additional affirmative acts taken by the cruise line to 'hold out' a doctor to be its agent." *Suter*, 2007 WL 4662144, at *6.

Here, Plaintiff alleges Celebrity "held out" Dr. Laubscher as an officer of the ship's crew "through his title, his uniform, his living quarters on board the ship and his offices on board the ship." (Resp. 13 (citing Compl. ¶ 265)). In particular, Plaintiff claims Dr. Laubscher wore a Celebrity uniform, which contained "epaulets and stripes indicating rank and hierarchy among the ship's other officers;" wore a Celebrity name tag; was given the title "Ship's physician;" used medical forms containing the Celebrity logo; was provided with living quarters on the ship; was assigned a Celebrity email address — m_seniordoctor@celebrity.com; and was under the command

19

of the ship's superior officers.  (Compl. ¶ 265).  Essentially, Plaintiff alleges Celebrity held Dr. Laubscher out as an officer of the ship and a Celebrity employee, not merely the shipboard doctor. Taking these allegations as true, Plaintiff has sufficiently alleged that Celebrity made manifestations which could cause Plaintiff to believe Dr. Laubscher was an agent of Celebrity.

Indeed, allegations that a doctor wore a ship's uniform, was a ship's officer, and was paid a salary by the cruise line have been found sufficient to prevent dismissal of an apparent agency claim at the motion to dismiss stage.  *See Hajtman*, 526 F. Supp. 2d at 1328 (allegations that medical official wore ship's uniform, ate with the ship's crew, was called ship's officer, worked aboard the ship, and was paid salary by cruise line were adequate to satisfy first prong of apparent agency analysis); *Doonan*, 404 F. Supp. 2d at 1371 (allegations that doctor wore ship's uniform, was addressed as officer, and was listed as a crew member in the brochure, were sufficient to survive motion to dismiss); *Suter*, 2007 WL 4662144 at *7 (allegations that shipboard doctor wore Carnival uniform, ate with ship's crew, was addressed by Carnival as an officer of the ship, and was under the command of ship's superior officers, were sufficient to satisfy first prong of apparent agency analysis).  Likewise, here, Plaintiff has sufficiently pleaded that Celebrity made some manifestation of agency that caused Plaintiff to believe Dr. Laubscher had the authority to act for the benefit of Celebrity.

**b.  Reasonable Belief**

The second element of an apparent agency claim is that the plaintiff's belief that the doctor was the cruise line's agent be reasonable.  In other words, a plaintiff must show that she reasonably believed the doctor "was acting on behalf of the [cruise line], was subject to [the cruise line's] control, and that the [cruise line] w[as] legally responsible for the doctor's actions."  *Warren* 1995

20

WL 688421, at *3.  Here, taking the allegations in the Complaint as true, a jury could find that Plaintiff reasonably believed Dr. Laubscher was Celebrity's agent.  In other words, a passenger on the cruise line, who observed Dr. Laubscher wearing the ship's uniform and Celebrity name tag, residing in Celebrity's living quarters, and operating under the command of Celebrity's officers, among other things, could develop a reasonable belief that Dr. Laubscher was an agent of Celebrity.

In making this determination, the Court is not persuaded by the holding in other cases that, in light of the longstanding principle that cruise lines are not liable for acts of their medical staff, any belief on a plaintiff's part that a doctor is an agent of the cruise line is inherently unreasonable. *See, e.g., Warren*, 1995 WL 688421, at *3 ("Plaintiff's belief may have been 'honest,' however, in view of the established law on this point, it was not reasonable."); *Hajtman*, 526 F. Supp. 2d at 1328–29 (holding that the "long standing maritime principle that carriers . . . are not vicariously liable for the acts of their medical staff" weighs against a finding that a passenger reasonably believed ship doctors are the agents of a cruise line).  Based on the rationale of those cases, a ship owner could never be held liable for the acts of medical doctors onboard the ship under any theory — not even an apparent agency theory.  The Court does not agree that a cruise line can affirmatively hold shipboard doctors out to passengers as their agents and still remain immune from liability simply because of the traditional maritime principle that shipboard doctors are not agents of the ship's owner.

The Court is equally unpersuaded by Celebrity's argument that the disclaimer contained in the passenger ticket contract precludes a finding that a plaintiff's belief in this regard is reasonable. Several courts addressing this issue have held that a passenger's belief that a doctor is an agent of the cruise line is unreasonable where there is a provision in the passenger ticket contract disclaiming

any such agency relationship.  *See, e.g., Peterson*, 753 F. Supp. 2d at 1248 (finding passenger's

belief of agency relationship between doctor and cruise line was unreasonable "when considered

together with the notice provided by the explicit agency disclaimer in the cruise ticket contract");

*Hajtman*, 526 F. Supp. 2d at 1329 (noting the language contained in the passenger ticket contract,

which stated that physicians on the ship are not to be considered agents, served as further notice to

plaintiff that no agency relationship existed between cruise line and doctors); *Wajnstat*, 2011 WL

465340, at *4 (same).

        In *Suter*, the undersigned rejected this same argument, concluding it was premature at the

motion to dismiss stage.  *See Suter*, 2007 WL 4662144, at *6–7.  Celebrity's argument is similarly

premature at this stage of the litigation.

### c.  Reliance on Belief

        Finally, in order to proceed on a theory of apparent agency, Plaintiff must show that she

relied on, or changed her position in reliance on, her belief that Dr. Laubscher was the cruise line's

agent.  To hold a principal liable for the acts of its purported agent under the doctrine of apparent

authority, "a party must show that, when dealing with the supposed agency, he has relied on the

agent's authority in good faith, in the exercise of reasonable prudence."  *Wells Fargo Bus. Credit*

*v. Ben Kozloff, Inc.*, 695 F.2d 940, 945 (5th Cir. 1982).  A party may demonstrate such reliance by

showing a change of position, which may include any "'payment of money, expenditure of labor,

suffering a loss or subjection to legal liability.'"  *Warren*, 1995 WL 688421, at *3 (quoting

RESTATEMENT (SECOND) OF AGENCY §§ 8B(1) and (3)).

        Here, Plaintiff claims she relied on her belief that Dr. Laubscher and the other medical staff

were Celebrity's agents when she "relied upon the care and skill of Dr. Laubscher both when her

finger was initially severed . . . and when she permitted him, at his insistence, to remove her bandages prematurely." (Compl. ¶ 268). She asserts that this reliance "proved detrimental to [her] as she received inadequate, and indeed, injurious treatment and suffered severe and permanent injury. . . ." (*Id.* ¶ 269). Essentially, Plaintiff alleges that, based on Celebrity's holding Dr. Laubscher out as an agent, Plaintiff allowed Dr. Laubscher to treat her and relied on his care and skill, and as a result, she was injured. These allegations sufficiently present facts demonstrating that Plaintiff relied on her belief that Dr. Laubscher was Celebrity's agent.

In sum, Claim V of the Complaint sufficiently pleads a claim for negligence against Celebrity under a theory of apparent agency.

### D.    Claim VI:  Fraudulent Misrepresentation

In Claim VI, Plaintiff asserts a claim against Celebrity for fraudulent misrepresentation based on allegedly false statements made by Dr. Laubscher as Celebrity's apparent agent. (*See* Compl. ¶¶ 270–90). Plaintiff alleges she accepted treatment from Dr. Laubscher in reliance on Dr. Laubscher's representation that he was an expert in the area of severed fingers. Celebrity challenges Plaintiff's claim of fraudulent misrepresentation on two grounds. First, Celebrity contends "[t]here are no true representations alleged in the Complaint which can be contributed [sic] directly to [Celebrity]." (Cruise Lines' Mot. 14). Second, Celebrity renews its assertion that Celebrity cannot be held liable on a theory of apparent agency for any misrepresentations made by Dr. Laubscher. (*Id.*). With regard to the second argument, as explained with respect to Claim V, Celebrity may be liable for Dr. Laubscher's torts under a theory of apparent agency. Therefore, the Court limits its analysis of Claim VI to whether the Complaint alleges sufficient factual matter to state a claim for fraudulent misrepresentation under general maritime law.

Case No. 11-21620-CIV-ALTONAGA/Simonton

As a preliminary matter, the Court observes that a plaintiff may recover for torts based on misrepresentation under general maritime law. *See, e.g.*, *Isham v. Padi Worldwide Corp.*, 2008 WL 877126, at *9 (D. Haw. Apr. 2, 2008) ("[G]eneral maritime law recognizes a claim for negligent misrepresentation.") (citing *Somarelf v. Am. Bureau of Shipping*, 704 F. Supp. 59, 63–64 (D.N.J. 1988) (recognizing a claim for negligent misrepresentation under general maritime law)); *see also Balaschak v. Royal Caribbean Cruises, Ltd.*, No. 09-21196-CIV, 2010 WL 457137, at *3 n.3 (S.D. Fla. Feb. 4, 2010) (relying on the Restatement for elements of negligent misrepresentation under maritime law) (Altonaga, J.). However, the Court has not been able to locate any maritime case specifically outlining the elements of fraudulent misrepresentation or deceit. Nevertheless, "where maritime law is silent on a particular issue, 'state law or general common-law principles may inform the general maritime law.'" *Isham*, 2008 WL 877126, at *9 (quoting *Ellenwood v. Exxon Shipping Co.*, 795 F.Supp. 31, 32 (D. Me. 1992)); *see also E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986) ("Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules.") (footnote call number omitted).

Accordingly, because the Court has not been able to identify a general maritime case where the elements of *fraudulent*, as opposed to *negligent*, misrepresentation are enumerated, it will draw on state law and general common-law principles to define the cause of action. *See Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967) ("[E]ven though admiralty suits are governed by federal substantive and procedural law, courts applying maritime law may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law.").

In Florida, "[t]he elements of a fraudulent misrepresentation claim are essentially the same

24

as those for negligent misrepresentation, except that, instead of proving that the representor reasonably should have known of the statement's falsity, the plaintiff must prove that the representor knew of the statement's falsity." *Levine v. Wyeth Inc.*, 684 F. Supp. 2d 1338, 1348 (M.D. Fla. 2010) (citing *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)).  Specifically, to state a claim for fraudulent misrepresentation a plaintiff must allege facts which show:

> (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.

*Johnson*, 480 So. 2d at 627.  Florida's statement of the elements of fraudulent misrepresentation parallels the tort as outlined in the RESTATEMENT (SECOND) OF TORTS § 557A[9] and in W. Keeton, D. Dobbs, R. Keeton & D. Owens, PROSSER AND KEETON ON TORTS, § 105 at 728 (5th ed. 1984). Notably, both the RESTATEMENT and PROSSER & KEETON state a plaintiff may recover for personal injury on a fraudulent misrepresentation claim.  *See* RESTATEMENT (SECOND) § 557A cmt. a ("The rule here stated permits a tort action of deceit to be maintained, when there is physical harm to [a] person."); PROSSER & KEETON § 105 at 726 ("There is no essential reason to prevent a deceit action from being maintained . . . for personal injuries."); *see also Flaherty v. Till*, 137 N.W. 815, 816 (Minn. 1912).[10]

---

[9] "One who by a fraudulent misrepresentation . . . causes physical harm to the person or to the land or chattel of another who justifiably relies upon the misrepresentation, is subject to liability to the other." RESTATEMENT (SECOND) TORTS § 557A.

[10] *Flaherty* is an instructive case.  In *Flaherty*,

> The plaintiff . . . was suffering from irritation of his stomach, and applied to the defendant [a charlatan] for advice and treatment, which he undertook to give.  Thereupon the defendant, for the purpose of deceiving the plaintiff, falsely and fraudulently made a pretended diagnosis of his condition, and advised him that he was suffering from rheumatism of the stomach, and that the proper and necessary treatment therefor was to

Even under the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which governs a pleading of fraud, Plaintiff has alleged sufficient facts to state a claim for fraudulent misrepresentation against Celebrity for the harms caused by Dr. Laubscher's false statements as its apparent agent.[11]  Plaintiff alleges that during at least two of his examinations of her, Dr. Laubscher falsely stated to Plaintiff that he was an expert in the area of severed fingers even though he knew he was not an expert in the field of treating severed fingers.  (*See* Compl. ¶¶ 53, 108).  The Complaint alleges Dr. Laubscher intended Plaintiff to rely on those statements to persuade her to first abandon the idea of re-attachment and then to allow him to prematurely remove the dressing on her healing finger contrary to her surgeon's instructions.  (*See id.* ¶¶ 54–56, 59, 108, 110–126).  Plaintiff explains that she believed Dr. Laubscher's false assertion that he possessed expertise treating severed fingers.  Therefore, she accepted Dr. Laubscher's initial diagnosis that re-attachment was impossible

---

> cover a large portion of his body with a plaster, which plaintiff is now advised consisted of olive, amber, and kerosene oils.  The defendant also represented as of his own knowledge to the plaintiff that such treatment would have no injurious effect upon his health, but that it would cure the ailments from which he was then suffering.  The defendant at the time of making such representations knew each of them to be false, and made them for the purpose of deceiving the plaintiff and inducing him to submit to the treatment and thereby get his money.  The plaintiff believed and relied upon the false representations, and submitted to the proposed treatment, which did not cure him, but, on the contrary, injured his health and severely blistered his body, causing poisonous sores and ulcers thereon . . . .

*Flaherty*, 137 N.W. at 815–16.  On these allegations, the court permitted a claim for fraud to go forward. *See id.* at 816.

[11]  Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  *See, e.g.*, *Holguin v. Celebrity Cruises, Inc.*, 2010 WL 1837808, at *2 (S.D. Fla. May 4, 2010).  A plaintiff must allege "(1) precisely what statements were made in what documents or oral representations . . . , and (2) the time and place of each such statement and the person responsible for making . . . same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation and internal quotation marks omitted).

and subsequently permitted him to remove her surgical bandages prematurely — both of which prevented the successful re-attachment of the finger.  (*See id.* ¶¶ 49, 53, 58, 78, 81, 110–126).

Plaintiff alleges, with the particularity required by Rule 9(b), the time, place, and content of the statements Dr. Laubscher made, that she relied on those statements, and that, as a result, Dr. Laubscher was able to get her to comply with his treatment plans.  She therefore states a claim for fraudulent misrepresentation. *Accord Flaherty*, 137 N.W. at 816 ("The injury to one's person by the fraud of another is quite as serious as an injury to his pocketbook, and . . . . [t]esting the allegations of the complaint by the rule stated, and construing them liberally, but without applause, we are of the opinion, and so hold, that they state facts sufficient to constitute a cause of action.").  Moreover, because Celebrity may be held liable for the torts of Dr. Laubscher on a theory of apparent agency, *see supra*, Part C, Plaintiff has stated a claim for fraudulent misrepresentation against Celebrity.

### E.  Claim VII: Vicarious Liability of Royal Caribbean Cruise Lines for Negligence

Claim VII alleges Royal Caribbean is vicariously liable for the negligence of its agent Celebrity Cruises because Celebrity is a wholly-owned subsidiary of Royal Caribbean.  (*See* Compl. ¶¶ 292–95).  The Complaint does not state what theory of vicarious liability Plaintiff is asserting against Royal Caribbean, but in the Response, Plaintiff suggests she will argue the Court should pierce the corporate veil of Celebrity and hold Royal Caribbean liable for Celebrity's alleged negligence.  (*See* Resp. 15–16).

"The prerequisites for piercing a corporate veil are as clear in federal maritime law as in shoreside law: The individual must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate entity's corporate form that the corporate entity primarily transacted the individual's personal business rather than its own corporate business." *Williamson*

Case No.  11-21620-CIV-ALTONAGA/Simonton

*v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008) (internal quotation and brackets omitted);

*see also Popescu v. CMA CGM*, No. 09-20860-CIV, 2009 WL 5606131, at *8 (S.D. Fla. Nov. 5,

2009) (Altonaga, J.). "[S]ole ownership does not alone justify piercing the corporate veil." *Popescu*,

2009 WL 5606131, at *9 (citing *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2nd Cir. 1980)).

Rather, the parent corporation's control must "'amount[] to total domination of the subservient

corporation, to the extent that the subservient corporation manifests no separate corporate interests

of its own and functions solely to achieve the purposes of the dominant corporation.'" *Baker v.*

*Raymond Int'l, Inc.*, 656 F.2d 173, 181 (5th Cir. 1981) (quoting *Krivo Indus. Supply Co. v. Nat'l*

*Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973), *modified per curiam*, 490 F.2d 916

(5th Cir. 1974)).

Plaintiff makes only two factual allegations in Claim VII.  First, she alleges that Royal

Caribbean purchased Celebrity in 1997, and second, that Celebrity is a wholly-owned subsidiary of

Royal Caribbean.  (*See* Compl. ¶¶ 292–93).  These factual allegations are insufficient to allow the

Court to plausibly infer that Royal Caribbean has totally dominated and controlled Celebrity to such

an extent that Celebrity has no corporate interests of its own.  Moreover, there are no allegations that

Royal Caribbean has used Celebrity to engage in fraud.  Indeed, the allegations in the Complaint are

completely unremarkable.  Corporations are frequently purchased by other corporations and become

wholly-owned subsidiaries of their purchaser.  The Court cannot allow a claim to go forward against

a parent company for the negligence of its subsidiary merely because the parent is the sole owner of

its subsidiary; some other factual allegations suggesting fraud or total domination and control are

Case No.  11-21620-CIV-ALTONAGA/Simonton

necessary.[12]  Accordingly, Claim VII against Royal Caribbean must be dismissed.

### F.  Claim XI: Gross Negligence Against Anderson Teak

Anderson Teak asserts "Plaintiff's claim for gross negligence is deficient because Plaintiff fails to raise any factual allegations whatsoever regarding reckless or wanton conduct." (Yap Defs.' Mot. 3).  In response, Plaintiff maintains she sufficiently pleads a claim for gross negligence.

"With admiralty jurisdiction comes the application of substantive admiralty law." *E. River S.S. Corp.*, 476 U.S. at 864.  "And, in admiralty law, common law principles of negligence apply." *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 252 (S.D.N.Y. 2001); *see also E. River S.S.*, 476 U.S. at 863–66 (incorporating principles of product liability into maritime law).  Therefore, the Court must look to the definition and application of gross negligence in admiralty law to determine whether Plaintiff properly states a claim.

Pinpointing the exact meaning of gross negligence under federal admiralty law proves surprisingly difficult.  As the Supreme Court acknowledged in an early admiralty case, the definition of gross negligence under federal common law is rather elusive:

> The theory that there are three degrees of negligence, described by the terms slight, ordinary, and gross, has been introduced into the common law from some of the commentators on the Roman law.  It may be doubted if these terms can be usefully applied in practice.  Their meaning is not fixed, or capable of being so.

---

[12] Evidence bearing on many of the factors that courts consider in determining whether to pierce the corporate veil can be gleaned from publicly available information.  *See, e.g.*, *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 75 (S.D.N.Y. 2009) (identifying veil-piercing factors, including some that can be determined from publicly-available information: common or overlapping directors and officers, use of same corporate office, inadequate capitalization of subsidiary, financing of subsidiary by parent, parent exists solely as holding company of subsidiaries, parent's use of subsidiaries' property and assets as its own, incorporation of subsidiary caused by parent, and parent and subsidiary's filing of consolidated income tax returns).  Accordingly, discovery seeking to uncover evidence that would permit veil-piercing will not be permitted absent some suggestion that the veil-piercing argument is plausible.

Case No.  11-21620-CIV-ALTONAGA/Simonton

*The Steamboat New World v. King*, 57 U.S. (16 How.) 469, 474 (1853).  Although some courts proceeding in admiralty have attempted define gross negligence, they have struggled to do so and the resulting definitions have proven ambiguous.  *See, e.g., Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986) ("Gross negligence is defined as harm willfully inflicted or caused by gross or wanton negligence."); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982) (same).

One discussion of gross negligence that is helpful comes from an early admiralty case in which Justice Story used an illustration to explain the concept:

> If a bag of apples were left in a street for a short time without a person to guard it, it would most certainly not be more than ordinary neglect.  But if the bag were of jewels or of gold, such conduct would be gross negligence.  In short care and diligence are to be proportioned to the value of the goods, and the temptation and facility of stealing them and the danger of losing them.

*Tracy v. Wood*, 24 F. Cas. 117 (C.C.D.R.I. 1822).  Essentially, Justice Story distinguished the two degrees of negligence by explaining that a reasonable person would not leave a bag of apples in the street, but not even an unreasonable person would leave a bag of jewels or gold unguarded in the street; therefore the negligence exhibited in the latter situation can be considered "gross."  A review of relevant admiralty case law reveals a general consensus that gross negligence involves some extreme departure from reasonable care coupled with a conscious awareness of the risk of harm.  *See, e.g., Hous. Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th Cir. 2001); *Sundance Cruises Corp. v. Am. Bureau of Shipping*, 799 F. Supp. 363, 379 (S.D.N.Y. 1992); *Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 112 (D. Mass. 2009) (quoting *Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis*, 2003 AMC 1681, 1693

Case No.  11-21620-CIV-ALTONAGA/Simonton

(2003)).[13]

This is consistent with the commonly accepted understanding of gross negligence even outside the admiralty context.  For example, Black's Law Dictionary defines gross negligence as "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party."  BLACK'S LAW DICTIONARY (9th ed. 2009).  It has also been described as "the want of even scant care" and "the failure to exercise even that care which a careless person would use." PROSSER & KEETON, § 34 at 183.  Similarly, the Restatement of Torts notes that the terms "gross negligence" and "recklessness" are often used interchangeably,[14] and explains that a person acts recklessly if:

> (a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and (b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk.

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 2 (2010).  These definitions are harmonious with the analysis of gross negligence in admiralty cases.  Consequently, after careful review of relevant authority, the Court finds gross negligence is present where a defendant "knows of the risk of harm created by the [defendant's] conduct or knows facts that make the risk obvious to another in the [defendant's] situation" and disregards that risk.  *Id.*

---

[13] Although *Water Quality Insurance Syndicate* dealt with gross negligence as defined by the United States Coast Guard National Pollution Funds Center, federal courts have stressed the need to adhere to the federal principles of uniformity and harmony when applying federal maritime law.  *See Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902 (11th Cir. 2004); *Suter*, 2007 WL 4662144, at *3.

[14] Indeed, Plaintiff uses the two terms synonymously, alleging that Anderson Teak is liable for gross negligence because its conduct "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the safety of persons exposed to such conduct."  (Compl. ¶ 331).

Case No. 11-21620-CIV-ALTONAGA/Simonton

In the instant case, Plaintiff alleges Anderson Teak's conduct "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the safety of persons exposed to such conduct." (Compl. ¶ 331). However, the Complaint does not contain any factual allegations indicating Anderson Teak was aware the Brianna Sun Lounger presented an increased risk of injury, and that despite such knowledge, Anderson Teak nevertheless manufactured and marketed the chair. Nor does Plaintiff present any allegations demonstrating that the risk would have been obvious to another in Anderson Teak's position. Instead, Plaintiff's argument rests on her allegation that after only cursory inspection, a professional accident reconstruction engineer immediately identified the design flaw which caused Plaintiff's injury. (*See* Resp. 4–5). Plaintiff claims this allegation demonstrates that Anderson Teak was grossly negligent. In other words, Plaintiff asserts that because the alleged design defect was readily discernible to the accident reconstruction engineer, the risk was equally obvious to Anderson Teak.

The Court does not find this allegation is sufficient to demonstrate Anderson Teak was aware of the danger posed by the chair, or had knowledge of facts that made the risk obvious to another in Anderson Teak's situation, and exhibited reckless disregard in designing and marketing the chair. The mere fact that the purported design flaw in the sun lounger was apparent to an accident reconstruction analyst/engineer who specializes in identifying defects and/or design flaws to determine the cause of an injury, does not mean the flaw was equally apparent to a manufacturer of such chairs. Notably, the engineer was examining the chair *after* the injury had already occurred for the purpose of deducing the cause of the injury. Thus, it is likely the engineer would more easily identify a design flaw in the chair than a manufacturer of the chair who has no indication that there is a potentially harmful defect.

32

Case No.  11-21620-CIV-ALTONAGA/Simonton

In sum, Plaintiff fails to present any allegations to support a finding that Anderson Teak knew or should have known of the risk posed by the sun lounger, but disregarded that risk.  Accordingly, Plaintiff's Complaint as pleaded does not state a claim for gross negligence against Anderson Teak.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1.  The Cruise Lines' Motion **[ECF No. 34]** is **GRANTED in part** and **DENIED in part**.

2.  Claims III and VII are **DISMISSED**.

3.  The Yap Defendants' Motion **[ECF No. 23]** is **GRANTED**.

4.  Claim XI is **DISMISSED**.

5.  Unless Plaintiff files an amended complaint, all Defendants shall respond to the Complaint **no later than August 31, 2011**.

**DONE AND ORDERED** in chambers at Miami, Florida, this 23rd day of August, 2011.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

33